**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| JEFFREY LENTINE, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | |
| ) | Case No. 3:17-cv-51 |
| v. ) | |
| ) | JURY TRIAL DEMANDED |
| FAIRPOINT COMMUNICATIONS, INC., ) PAUL H. SUNU, EDWARD D. ) HOROWITZ, PETER D. AQUINO, DENNIS ) J. AUSTIN, PETER C. GINGOLD, ) MICHAEL J. MAHONEY, MICHAEL K. ) ROBINSON, DAVID L. TREADWELL, ) WAYNE WILSON, CONSOLIDATED ) COMMUNICATIONS HOLDINGS, INC., ) and FALCON MERGER SUB, INC., ) ) | CLASS ACTION |
| Defendants. ) | |

<u>**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**</u>

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This action stems from a proposed transaction announced on December 5, 2016 (the "Proposed Transaction"), pursuant to which FairPoint Communications, Inc. ("FairPoint" or the "Company") will be acquired by Consolidated Communications Holdings, Inc. ("Parent") and Falcon Merger Sub, Inc. ("Merger Sub," and together with Parent, "Consolidated Communications").

2.      On December 3, 2016, FairPoint's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger

Agreement"). Pursuant to the terms of the Merger Agreement, shareholders of FairPoint will receive 0.7300 shares of Parent common stock for each share of FairPoint common stock. Based on Parent's closing stock price on December 2, 2016, the merger consideration was valued at approximately $20.72 per share. However, based on Parent's closing stock price on January 20, 2017, the merger consideration is valued at only approximately $19.13 per share.

3. On January 26, 2017, defendants filed a Form S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

<u>**JURISDICTION AND VENUE**</u>

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

2

## PARTIES

8.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of FairPoint common stock.

9.     Defendant FairPoint is a Delaware corporation and maintains its principal executive office at 521 East Morehead Street, Suite 500, Charlotte, North Carolina 28202. FairPoint's common stock is traded on the NasdaqCM under the ticker symbol "FRP."

10.     Defendant Paul H. Sunu ("Sunu") is a director of FairPoint and has served as Chief Executive Officer ("CEO") of the Company since August 2010.

11.     Defendant Edward D. Horowitz ("Horowitz") is a director and Chairman of the Board of FairPoint.  According to the Company's website, Horowitz is Chair of the Corporate Governance and Nominating Committee and a member of the Compensation Committee.

12.     Defendant Peter D. Aquino ("Aquino") is a director of FairPoint.  According to the Company's website, Aquino is a member of the Audit Committee and the Regulatory Committee.

13.     Defendant Dennis J. Austin ("Austin") is a director of FairPoint.  According to the Company's website, Austin is a member of the Audit Committee and the Regulatory Committee.

14.     Defendant Peter C. Gingold ("Gingold") is a director of FairPoint.  According to the Company's website, Gingold is a member of the Compensation Committee.

15.     Defendant Michael J. Mahoney ("Mahoney") is a director of FairPoint. According to the Company's website, Mahoney is Chair of the Regulatory Committee and a member of the Compensation Committee.

16.     Defendant Michael K. Robinson ("Robinson") is a director of FairPoint. According to the Company's website, Robinson is a member of the Audit Committee and the Corporate Governance and Nominating Committee.

17.     Defendant David L. Treadwell ("Treadwell") is a director of FairPoint. According to the Company's website, Treadwell is Chair of the Compensation Committee and a member of the Corporate Governance and Nominating Committee.

18.     Defendant Wayne Wilson ("Wilson") is a director of FairPoint. According to the Company's website, Wilson is Chair of the Audit Committee.

19.     The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

20.     Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

21.     Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of FairPoint (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

23.     This action is properly maintainable as a class action.

24.     The Class is so numerous that joinder of all members is impracticable. As of December 2, 2016, there were approximately 27.9 million shares of FairPoint common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

25.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

26.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

27.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

28.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company*

29.     FairPoint provides advanced data, voice, and video technologies to single and multi-site businesses, public and private institutions, consumers, wireless companies, and wholesale re-sellers in seventeen states.

5

30.     Leveraging an owned, fiber-core Ethernet network, including more than 16,000 route miles of fiber in northern New England, FairPoint has the network coverage, scalable bandwidth, and transport capacity to support enhanced applications, including the next generation of mobile and cloud-based communications, such as small cell wireless backhaul technology, voice over IP, data center colocation services, managed services, and disaster recovery.

31.     On November 2, 2016, FairPoint issued a press release wherein it reported its financial results for the third quarter of 2016. The Company reported that revenue increased $0.5 million during the third quarter of 2016 to $207.1 million. Growth revenue increased $1.8 million, or 2.8%, and miscellaneous revenue increased $1.2 million. Net income was $40.2 million in the third quarter of 2016 compared to $29.3 millJeffrion in the second quarter of 2016. Adjusted EBITDA increased $0.8 million to $63.9 million in the third quarter of 2016 compared to $63.1 million in the second quarter of 2016. Compared to the third quarter of 2015, growth revenue increased by $2.3 million and miscellaneous revenue increased $0.8 million.

32.     With respect to the financial results, Individual Defendant Sunu commented:

We remain focused on improving our customers' experience and our third quarter results show continued progress in our efforts to transform revenue while mitigating losses in legacy products[.] Total revenue was up slightly from the second quarter and growth revenue contributed 31.7% of that total. In addition, expenses remained well managed to continue to deliver solid profitability.

Efforts continue to harden our network and evolve our product and service offering to provide effective communications solutions[.] Our investments to extend our fiber footprint and upgrade network equipment to provide faster broadband speeds are increasing service reliability, reducing churn and better positioning us to compete for residential broadband customers. In addition, we continue to develop new products and capabilities to more effectively serve small and medium sized businesses which are an important element of many of our markets.

*The Preclusive Merger Agreement*

33.     On December 3, 2016, the Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

34.     Pursuant to the terms of the Merger Agreement, shareholders of FairPoint will receive 0.7300 shares of Parent common stock for each share of FairPoint common stock they own.  Based on Parent's closing stock price on December 2, 2016, the merger consideration was valued at approximately $20.72 per share.  However, based on Parent's closing stock price on January 20, 2017, the merger consideration is valued at only approximately $19.13 per share.

35.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.   Section 7.7(a) of the Merger Agreement states:

> (a) During the period beginning on the date of this Agreement and continuing until the earlier of the Effective Time and the termination of this Agreement in accordance with Section 9.1, the Company and its Subsidiaries and their respective officers and directors shall, and the Company shall instruct and cause its and its Subsidiaries' other Representatives to, cease and cause to be terminated any discussions or negotiations with any Person that would otherwise be prohibited by this Section 7.7(a). Promptly following the execution of this Agreement, the Company shall deliver a written notice to each such Person to the effect that, subject to the provisions of this Section 7.7, the Company is ending all discussions and negotiations with such Person with respect to any Alternative Proposal, effective on and from the date of this Agreement, and the notice shall also request such Person to promptly return or destroy all confidential information concerning the Company and/or its Subsidiaries. Subject to the provisions of this Section 7.7, during the period commencing on the date of this Agreement and continuing until the earlier to occur of the Effective Time and the Termination Date, the Company and its Subsidiaries shall not, and shall cause its and their

respective Representatives not to, directly or indirectly, (i) solicit (including by way of furnishing non-public information), initiate or knowingly encourage or facilitate any inquiry with respect to, or the making, submission or announcement of, any proposal or offer that constitutes, or is reasonably expected to lead to, an Alternative Proposal, (ii) furnish to any Person (other than Parent or Merger Sub or their respective designees) any non-public information relating to the Company and/or its Subsidiaries, or afford to any Person access to the business, properties, assets, books, records or other non-public information, or to any personnel, of the Company and/or its Subsidiaries (other than Parent or Merger Sub or their respective designees), in any such case relating to an Alternative Proposal or any inquiries or the making of any proposal that could lead to an Alternative Proposal, (iii) engage in, continue or otherwise participate in any discussions or negotiations regarding any Alternative Proposal with any Person, except to notify such Person as to the existence and content of the provisions of this Section 7.7, or (iv) grant any waiver, amendment or release under any standstill or confidentiality agreement (except for any portion of any such standstill or confidentiality agreement that restricts the ability of a Person to communicate an Alternative Proposal to Company Board), or anti-takeover laws.

36.     Further, the Company must promptly advise Consolidated Communications of any proposals or inquiries received from other parties.  Section 7.7(e) of the Merger Agreement states, in relevant part:

(e) The Company shall keep Parent reasonably informed regarding the matters contemplated by this Section 7.7 (including any Alternative Proposals). Without limiting the generality of foregoing, (i) the Company shall promptly notify Parent if any proposals or offers with respect to an Alternative Proposal are received by the Company or any of its Representatives indicating, in connection with such notice, the material terms and conditions of any proposals or offers (including, if applicable, copies of any written requests, proposals or offers, including proposed agreements) and thereafter shall keep Parent reasonably informed, on a prompt basis, of the status and material terms of any such proposals or offers (including any material amendments thereto), including any change in the Company's intentions as previously notified, and (ii) the Company agrees that it will promptly notify Parent if any non-public information is requested from, or any discussions or negotiations are sought to be initiated or continued with, the Company or any of its Representatives indicating, in connection with such notice, the status of any such discussions or negotiations, including any change in the Company's intentions as previously notified. The Company agrees that it and its Subsidiaries will not enter into any confidentiality agreement with any Person subsequent to the date hereof which prohibits the Company from providing such information to Parent.

37.    Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Consolidated Communications a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 7.7(d) of the Merger Agreement provides:

> (d) Notwithstanding anything to the contrary set forth in this Agreement, if at any time prior to the time that this Agreement shall have been approved by the Company Required Vote, (i) the Company is then in receipt of a bona fide written Alternative Proposal from any Person that is not withdrawn and that the Company Board concludes in good faith (after consultation with its financial advisor and outside legal counsel) constitutes a Superior Proposal, or (ii) if there occurs any Fiduciary Change, the Company Board may (1) effect a Company Recommendation Change, and/or (2) in the case of a Superior Proposal, adopt, approve, endorse or recommend, or publicly propose to adopt, approve, endorse or recommend, to the stockholders of the Company any such Superior Proposal and authorize the Company to terminate this Agreement in accordance with Section 9.1(c)(ii) to enter into an Alternative Acquisition Agreement with respect to such Superior Proposal (provided, however, that in such event under this clause (2), the Company concurrently terminates this Agreement pursuant to Section 9.1(c)(ii) and enters into a definitive Alternative Acquisition Agreement with respect to such Superior Proposal), provided that the Company Board may effect a Company Recommendation Change, if and only if:
>
> (i) the Company Board shall have determined in good faith (after consultation with its financial advisor and outside legal counsel) that failure to take such action would be inconsistent with the directors' exercise of their fiduciary obligations to the stockholders of the Company under applicable laws; and
>
> (ii) the Company shall have validly terminated this Agreement in accordance with Section 9.1(c)(ii), including the payment of the Company Termination Fee in accordance with Section 9.2(a); provided, however, that (A) prior to terminating this Agreement, the Company shall give Parent at least three (3) Business Days' notice thereof, attaching the Alternative Proposal Agreement (or, if applicable, the most current draft thereof), which notice need only be given once with respect to any Superior Proposal, unless such Superior Proposal is modified in any material respect in which case the three (3) Business Day period referred to herein shall be 48 hours, and (B) if, within such three (3) Business Day period (or where applicable, 48-hour period), Parent makes an offer to the Company that the Company Board determines in good faith is more favorable to the stockholders of the Company (other than Parent, Merger Sub and their respective Affiliates), from a financial point of view, than such Superior Proposal (taking into account, among

9

other things, (I) the terms of such offer and (II) all legal, financial (including the financing terms thereof), regulatory, timing and other aspects of such offer which the Company Board deems relevant), and agrees in writing to all adjustments in the terms and conditions of this Agreement as are necessary to reflect such offer, the Company's notice of termination with respect to such Superior Proposal shall be deemed to be rescinded and of no further force and effect and, if the Company or any Subsidiary of the Company has entered into a Superior Proposal Agreement, it shall promptly terminate such agreement (it being agreed that the Company will cause any Alternative Acquisition Agreement entered into prior to the expiration of such three (3) Business Day period (or where applicable, 48-hour period) to include a provision permitting such termination).

38.    Further locking up control of the Company in favor of Consolidated Communications, the Merger Agreement provides for a "termination fee" of $18,900,000, payable by the Company to Consolidated Communications if the Individual Defendants cause the Company to terminate the Merger Agreement.

39.    By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

***Inadequate Merger Consideration and Interests of the Company's Officers and Directors***

40.    The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

41.    Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

42.    The merger consideration also fails to adequately compensate the Company's shareholders for the significant synergies that will result from the merger.

43.    Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

44.     Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

45.     For example, one of the Individual Defendants will join the Consolidated Communications board of directors following the close of the Proposed Transaction.

46.     Moreover, Individual Defendant Sunu stands to receive $5,730,902 in connection with the merger, and the other named executive officers of the Company stand to receive $6,681,072.

***The Registration Statement Omits Material Information, Rendering It False and Misleading***

47.     Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.

48.     The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading.

49.     First, the Registration Statement omits material information regarding the Company's financial projections, Consolidated Communications' financial projections, the financial analyses performed by the Company's financial advisor, Evercore L.L.C. ("Evercore"), in support of its so-called fairness opinion, and the financial analyses performed by Consolidated Communications' financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley").

50.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support

of its fairness opinion.

51.     With respect to FairPoint's financial projections, the Registration Statement fails to disclose, for each year of projections:  (i) cash pension; (ii) "other post-employment benefit contribution"; (iii) cash taxes; (iv) projected net operating losses; (v) projected net debt; and (vi) projected share count.

52.     With respect to Evercore's *Discounted Cash Flow Analysis* for FairPoint, the Registration Statement fails to disclose:  (i) the standalone unlevered, after-tax free cash flow that FairPoint was projected to generate from December 31, 2016 through calendar year 2021 and all constituent line items used in the calculation of unlevered free cash flow; (ii) the calculated terminal values for FairPoint resulting from each of the methodologies; and (iii) the amounts of FairPoint's pension and other post-retirement benefit liabilities used by Evercore.

53.     With respect to Evercore's *Discounted Cash Flow Analysis* for Consolidated Communications, the Registration Statement fails to disclose:  (i) the standalone unlevered, after-tax free cash flow that Consolidated Communications was projected to generate from December 31, 2016 through calendar year 2020 and all constituent line items used in the calculation of unlevered free cash flow; (ii) the calculated terminal values for Consolidated Communications resulted from each of the methodologies; and (iii) the amounts of Consolidated Communications' pension and post-retirement expenses used by Evercore.

54.     With respect to Evercore's *Net Present Value of Future Stock Price Analysis* for Consolidated Communications, the Registration Statement fails to disclose the projections of net debt and share count used by Evercore.

55.     The Registration Statement fails to disclose Consolidated Communications' financial projections, which are particularly material here, as the merger consideration is

Consolidated Communications stock.

56.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis* for FairPoint, the Registration Statement fails to disclose:  (i) the estimated unlevered free cash flow of FairPoint for the period from January 1, 2017 to December 31, 2021 and all constituent line items used in the calculation of unlevered free cash flow; and (ii) the calculated terminal values for FairPoint.

57.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis* for Consolidated Communications, the Registration Statement fails to disclose:  (i) the estimated unlevered free cash flow of Consolidated Communications for the period from January 1, 2017 to December 31, 2021 and all constituent line items used in the calculation of unlevered free cash flow; and (ii) the calculated terminal values for Consolidated Communications.

58.     With respect to Morgan Stanley's *Comparable Public Companies* analysis, the Registration Statement fails to disclose the multiples and financial metrics for the companies observed by Morgan Stanley in its analysis.

59.     With respect to Morgan Stanley's *Precedent Strategic Transactions Analysis*, the Registration Statement fails to disclose the multiples and financial metrics for the transactions observed by Morgan Stanley in its analysis.

60.     The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement:  (i) "Background of the Merger"; (ii) "Recommendation of the FairPoint Board; FairPoint's Reasons for the Merger"; (iii) "Opinion of Financial Advisor to FairPoint"; (iv) "Certain Prospective Financial Information Reviewed by the FairPoint Board and FairPoint's Financial Advisor"; and (v) "Opinion of Financial Advisor to Consolidated."

61.     Second, the Registration Statement omits material information regarding the background of the Proposed Transaction.  The Company's stockholders are entitled to an accurate description of the "process" the directors used in coming to their decision to support the Proposed Transaction.

62.     For example, the Registration Statement fails to disclose whether any of the confidentiality agreements entered into by FairPoint and the various parties contained standstill and/or "don't ask, don't waive" provisions that prevented or are preventing parties from submitting topping bids to acquire the Company or requesting a waiver of standstill provisions.

63.     The Registration Statement also fails to disclose the financial terms of the proposals submitted by FairPoint to Party C and Party G.

64.     The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Merger"; and (ii) "Recommendation of the FairPoint Board; FairPoint's Reasons for the Merger."

65.     Third, the Registration Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

66.     Specifically, the Registration Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of FairPoint's officers and directors, including who participated in all such communications.

67.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that

information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

68. The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Merger"; (ii) "Recommendation of the FairPoint Board; FairPoint's Reasons for the Merger"; and (iii) "Interests of FairPoint Directors and Executive Officers in the Merger."

69. Fourth, the Registration Statement omits material information regarding potential conflicts of interest of Evercore.

70. Specifically, the Registration Statement fails to disclose the services Evercore previously provided to FairPoint, as well as the amount of the fees paid to Evercore by FairPoint for such services.

71. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

72. The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Background of the Merger"; (ii) "Recommendation of the FairPoint Board; FairPoint's Reasons for the Merger"; and (iii) "Opinion of Financial Advisor to FairPoint."

73. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to FairPoint's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and FairPoint**

74. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

15

75.     The Individual Defendants disseminated the false and misleading Registration Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  FairPoint is liable as the issuer of these statements.

76.     The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.   By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

77.     The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

78.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

79.     The Registration Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

80.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

81.     Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

**Claim for Violation of Section 20(a) of the 1934 Act
Against the Individual Defendants and Consolidated Communications**

82.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

83.     The Individual Defendants and Consolidated Communications acted as controlling persons of FairPoint within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of FairPoint and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

84.     Each of the Individual Defendants and Consolidated Communications was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

85.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Registration Statement.

86.     Consolidated Communications also had direct supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the

information that was omitted and/or misrepresented in the Registration Statement.

87.     By virtue of the foregoing, the Individual Defendants and Consolidated Communications violated Section 20(a) of the 1934 Act.

88.     As set forth above, the Individual Defendants and Consolidated Communications had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.     Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: February 7, 2017

**THE LAW OFFICES OF JASON E. TAYLOR P.C.**

By: _/s/ Gary W. Jackson_

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

**PROFY PROMISLOFF & CIARLANTO, P.C.**
Joseph Profy
100 N. 22nd Street Unit 105
Philadelphia, PA 19103
(215) 259-5156

Gary W. Jackson (NC Bar # 13976)
301 S. McDowell Street, Suite 1016
Charlotte, NC 28204
(800) 351-3008

_Attorneys for Plaintiff_

# CERTIFICATION OF PLAINTIFF

I, Jeffrey Lentine ("Plaintiff"), hereby declare as to the claims asserted under the federal securities laws that:

1.  Plaintiff has reviewed the complaint and authorizes its filing.

2.  Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon the execution of this Certification.

4.  Plaintiff's purchase and sale transactions in the FairPoint Communications, Inc. (Nasdaq CM: FRP) security that is the subject of this action during the class period is/are as follows:

PURCHASES                                    SALES

| Buy Date | Units | Price per Unit |
|----------|-------|----------------|
| 2/28/01  | 2.337 |                |
|          |       |                |
|          |       |                |
|          |       |                |

| Sell Date | Units | Price per Unit |
|-----------|-------|----------------|
|           |       |                |
|           |       |                |
|           |       |                |
|           |       |                |

*Please list additional transactions on separate sheet of paper, if necessary.*

5.  Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6. During the three years prior to the date of this Certification, Plaintiff has not moved to serve as a representative party for a class in an action filed under the federal securities laws.

7. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6 day of Feb , 2017.

_____
Signature

JEFFREY LEVINE
Print Name

2